******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MATTHEW
O'BRIEN-VEADER
(SC 19038)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued January 14—officially released September 8, 2015*

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terrence Mariani* and *Amy L. Sedensky*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

ROBINSON, J. The principal issue in this appeal requires us to determine when a prosecutor's apparent breach of a trial court ruling becomes prosecutorial impropriety implicating a defendant's due process right to a fair trial, rather than an evidentiary matter without constitutional import. The defendant, Matthew O'Brien-Veader, appeals[1] from the judgment of the trial court, rendered after a jury trial, convicting him of murder in violation of General Statutes § 53a-54a (a),[2] kidnapping in the second degree in violation of General Statutes § 53a-94 (a), and felony murder in violation of General Statutes § 53a-54c. On appeal, the defendant claims that he is entitled to a new trial because: (1) numerous instances of prosecutorial impropriety during the cross-examination of the defendant's expert witness and closing arguments deprived him of his right to a fair trial; (2) the trial court improperly denied his motions for a mistrial; (3) the evidence is insufficient to support his kidnapping conviction under *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008); and (4) the trial court improperly precluded the testimony of two witnesses who would have corroborated his defense of extreme emotional disturbance. We disagree with all of these claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. In the spring of 2009, the defendant was twenty-one years old and working for a residential construction company. He shared an apartment in Waterbury with several friends and coworkers in a multifamily house on East Liberty Street. In June, 2009, the defendant quit his job and moved out of the apartment, despite being invited to remain there. The defendant then moved into an abandoned factory building in Waterbury where the victim, Joed Olivera, lived. The two men, who had been friendly since the defendant was fourteen years old, lived on the building's third floor, which was full of garbage and lacked power and water. They shared a large mattress in that makeshift living space.

The relationship between the defendant and the victim rapidly deteriorated. The defendant stated that the victim "had been making some comments" that "made [him] feel uncomfortable." After the defendant confronted the victim about a perceived sexual advance, the victim told the defendant that he had ejaculated on him one night. Because of his increasing anger over what the victim had told him, on June 8, 2009, the defendant checked into a motel with his girlfriend, Samantha O'Connor. At the motel, the defendant told O'Connor about his discomfort with the victim, and his intention to kill him.

The following day, June 9, 2009, the defendant

returned to the factory. In a statement to police, the defendant recounted the events of that day as follows: "I just hung out with [the victim] all day at the factory. [The victim] said it was safe and he wasn't going to do anything to me. I told [the victim] that if he had some kind of crush on me then he had to tell me so I could leave. I told [the victim] again that I had a girlfriend and I am not a fag. I asked him if I could trust him and he said 'yes.' Eventually I went to sleep . . . in the corner of the bed. But before I went to sleep I had a knife on me. . . . I went to sleep with the knife because if [the victim] tried any of the faggot shit with me I was going to kill him. If I felt a hand in the wrong place I probably would have cut his hand off. . . . I fell asleep and nothing happened that night."

The defendant's statement continued: "For some reason when I woke up I felt like I was violated, I kept thinking about [the victim] saying he jerked off on me. Every minute that went by, I got madder and madder. [The victim] gave me [$10] and asked me to go [buy] beer . . . . I took the money and . . . bought a [$5] bag of . . . marijuana. I went back to the factory and stayed on the first floor and smoked some of the [marijuana]. I was pacing back and forth thinking about what I was going to do to [the victim]. I decided that I needed to kill [the victim] for what he did to me. I wanted answers from him and I was going to get them before I killed him."

The defendant then went upstairs to the third floor to see the victim, who asked why he had not purchased any beer. Following an angry exchange, in which the defendant asked the victim why he had ejaculated on him and the victim accused the defendant of being "selfish and . . . trying to screw him over" because of the beer money, the confrontation turned physical. The defendant believed that the victim saw his knife, which the defendant had hidden in the sleeve of his sweatshirt, and the victim started moving toward a second knife that was sticking out of a nearby wall. At that point, the defendant took the second knife out of the wall, grabbed the victim by the shoulder, and tried to throw him down a flight of stairs that led to the second floor. When the victim caught himself in the middle of the staircase, the defendant began to beat him repeatedly with a pair of crutches that the victim used because he had a foot injury.

The defendant then tried to push the victim through a hole in the floor at the bottom of the stairs so that the victim would fall down to the first floor. When the victim's leg and part of his body were in the hole, he pleaded and apologized to the defendant, who continued to yell at him, "[w]hy did you do this to me . . . I trusted you, you were like a father to me." After the victim climbed out of the hole, the defendant hit him with a metal rod and his fists. The defendant subse-

quently forced the victim at knifepoint to go back up the stairs, so he could push him down a larger hole between the third and second floors. The defendant stated that he wanted the victim "to suffer and be tortured." The defendant then pushed the victim through that hole, causing him to land on wood and debris on the second floor below. As the victim continued to plead with the defendant, the defendant hit him with a fluorescent light tube, and then stabbed him in the neck, chest, shoulder, and head with the dagger more than thirty times until the victim appeared dead.[3] The defendant then covered the victim's body with debris, and gathered his belongings from the third floor.

After cleaning himself up and burying his blood covered knife and sweatshirt nearby, the defendant purchased a forty ounce container of Natural Light beer, returned to the factory, and poured some of it on the victim's body "because . . . it was his favorite." While sitting on the third floor, the defendant saw a note inviting him and the victim to come to the East Liberty Street house to meet some friends, among whom were Jason Benoit and Gary Peden. The defendant visited his friends at their house, and when Benoit asked the defendant where the victim was, the defendant—with no change in his ordinary demeanor—confessed what he had done. Benoit did not believe the defendant, so the defendant brought him to the factory and showed him the victim's body. Benoit and the defendant then went to pick up O'Connor at her grandmother's house in Naugatuck. The defendant also sought to retrieve his tools so that Benoit and Corey Bosse, another friend, could pawn them for him.

After he confessed to her, O'Connor did not believe what the defendant had done and wanted to see the body, so the defendant again returned to the factory with her, Benoit, and another friend, Dominic Wells. O'Connor and the defendant then went to Saint Mary's Hospital in Waterbury where the defendant received treatment for cuts to his hand sustained during his attack on the victim.

The defendant and O'Connor spent that night at his friends' house on East Liberty Street. The following day, the defendant decided to leave Connecticut, and he and O'Connor began to walk to her grandmother's home in Naugatuck. In the meantime, Bosse reported the defendant's actions to the Waterbury police, who, with the subsequent assistance of Benoit, located the victim's body on June 11, 2009. Waterbury police officers subsequently apprehended the defendant on his walk to Naugatuck, and he later confessed to Detectives Michael Slavin and Orlando Rivera.

The state charged the defendant with murder in violation of § 53a-54a (a), felony murder in violation of § 53a-54c, and kidnapping in the second degree in violation of § 53a-94 (a). The case was tried to a jury, and the

defendant did not contest having killed the victim, but asserted a defense of extreme emotional disturbance, which, under § 53a-54a, would reduce his murder conviction to manslaughter in the first degree in violation of General Statutes § 53a-55 (a). The defendant presented this case primarily through the expert testimony of Seth Feuerstein, a psychiatrist, who opined that, because of the defendant's severe homophobia, his actions at the time of the attack constituted an emotional "reaction," albeit one without a "formal psychiatric diagnosis . . . ."[4] Subsequently, the jury returned a verdict finding the defendant guilty on all counts, and that he had not proven the affirmative defense of extreme emotional distress by a preponderance of the evidence. The trial court rendered a judgment of conviction in accordance with the jury's verdict, and sentenced the defendant to a total effective sentence of forty-seven years imprisonment.[5] This direct appeal followed.

On appeal, the defendant claims that: (1) numerous acts of prosecutorial impropriety during both the cross-examination of Feuerstein and closing arguments warrant reversal of his conviction; (2) the trial court improperly denied the defendant's motions for a mistrial; (3) the evidence is insufficient to support the kidnapping and felony murder convictions; and (4) the trial court improperly precluded two defense witnesses from testifying. Additional relevant facts and procedural history will be set forth when necessary.

## I

## PROSECUTORIAL IMPROPRIETY

We begin with the defendant's claim that the trial prosecutor[6] "committed repeated, flagrant and egregious improprieties" during the cross-examination of Feuerstein and closing arguments, which deprived him of a fair trial. We address each specific claim of impropriety in turn.[7]

The following general background principles guide our analysis. "[A] claim of prosecutorial impropriety . . . even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process.[8] . . . The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] [was harmful and thus] caused or contributed to a due process violation is a separate and distinct question . . . ." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 434, 64 A.3d 91 (2013). The defendant bears the burden

of satisfying both of these analytical steps. See *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012). In evaluating whether a defendant has carried that burden, we recognize that prosecutorial inquiries or comments that might be "questionable" when "read in a vacuum" often are, indeed, appropriate when "review[ed] . . . in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 45, 917 A.2d 978 (2007). Accordingly, we supply in the footnotes relatively lengthy transcript excerpts that are necessary to put the challenged remarks and questions in their proper context.

## A

## Whether the Prosecutor Improperly Used Sarcasm, Personal Attacks, and Appeals to Emotion during Cross-Examination

We begin with the defendant's challenges to certain of the prosecutor's questions during his cross-examination of Feuerstein as containing improper sarcasm, personal attacks, and emotional appeals, namely: (1) a characterization of the defendant as " 'a mean and nasty person who was looking to kill somebody' "; (2) a query that Feuerstein's " 'testimony here is not really based on any hard science' "; (3) creating images of the "defendant engaged in a murderous fight over $10"; and (4) a "sneering comparison of the $10 given by the victim to the defendant to . . . Feuerstein's hourly rate . . . ." In response, the state contends that, viewed in context, these questions were part of a legitimate challenge to the premise and reliability of Feuerstein's expert testimony, including the exploration of alternative explanations for the defendant's conduct besides extreme emotional distress. Having reviewed these claims in the context of the full record, we conclude that only the "mean and nasty" characterization was improper.

"A basic and proper purpose of cross-examination of an expert is to test that expert's credibility. . . . Thus, [i]t is well established that an expert witness can be examined concerning the factual basis of his [or her] opinion. . . . Consequently, [i]n cases [in which] the defendant places his [or her] mental status in issue, the basis for a psychiatric expert's opinion is one of the things that the trier of fact may consider in evaluating the testimony of that expert." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 327, 746 A.2d 761 (2000). "Though it is manifestly the purpose of cross-examination to expose to the jury facts from which it may gauge the credibility of an expert witness . . . a prosecutor may not express his own opinion of the witness' credibility, such as by engaging in a line of questioning designed to mock and belittle that witness." (Citations omitted; emphasis omitted.) *State* v. *Wilson*, supra, 308 Conn. 437–38.

Further, it is well settled that a "prosecutor may not

appeal to the emotions of the jurors by engaging in character assassination and personal attacks against either the defendant or one of his witnesses. . . . A prosecutor may not ask a question or make a comment during cross-examination that suggests that the defendant has a bad character or propensity for criminal behavior." (Citation omitted.) *State* v. *Warholic*, 278 Conn. 354, 389–90, 897 A.2d 569 (2006). "It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible." *State* v. *Albino*, 312 Conn. 763, 773, 97 A.3d 478 (2014).

## 1

### "Mean and Nasty Person" Comment

We begin with the defendant's claim that the prosecutor improperly referred to him during cross-examination as a "mean and nasty person who was looking to kill somebody." Read in context, we agree with the defendant that this reference was an inappropriate personal attack that warranted the trial court's exercise of its discretion to sustain the defendant's objection to that question. A review of the transcript demonstrates that the "mean and nasty" comment apparently was posited as an alternative explanation to Feuerstein's point that the defendant's act was an uncharacteristic extreme emotional reaction to what he perceived as sexual misconduct by the victim.[9] Contrary to the state's arguments, this comment was a gratuitous, crudely phrased, and inflammatory description that was not necessary to advance the prosecutor's otherwise well supported point, namely, that Feuerstein's assessment was based on an apparently incomplete picture of the defendant's psychiatric history. Cf. *State* v. *Andrews*, 313 Conn. 266, 295–96, 96 A.3d 1199 (2014) (prosecutor's description of defendant as " 'hardened criminal' " was "not denigrating and sarcastic but fairly described the defendant in language reflecting his criminal past"). The prosecutor's reference to the defendant as "a mean and nasty person who was looking to kill somebody"[10] was particularly gratuitous given that it was uncontested that the defendant had committed the homicidal act in this case.[11] Accordingly, we conclude that this reference to the defendant as a "mean and nasty person who was looking to kill somebody" constituted prosecutorial impropriety.[12]

## 2

### Other Challenged Questions

We next turn to the defendant's challenges to the prosecutor's (1) suggestion that Feuerstein's " 'testimony here is not really based on any hard science,' "

(2) representation, during cross-examination, that the "defendant engaged in a murderous fight over $10," and (3) "sneering comparison of the $10 given by the victim to the defendant to . . . Feuerstein's hourly rate . . . ."

We first conclude that the prosecutor's question asking whether Feuerstein would agree "that the substance of [his] testimony here is not really based on any hard science," was, read in context, not a gratuitous personal attack on Feuerstein. Rather, that statement was a proper—albeit aggressively phrased—attack on the credibility of Feuerstein's opinion by questioning him about the methods that yielded the underlying data.[13] See *State* v. *Wilson*, supra, 308 Conn. 439–41 (concluding that prosecutor's characterization of inexperienced expert witness' work on case "as a 'maiden voyage'" was not improper ad hominem attack, but also concluding that it was improper name calling for prosecutor to call expert "'Pete the carpenter'" or "'piece of work'"). Contrary to the defendant's arguments in his reply brief, the statement at issue in this case is not comparable to those contemplated in *State* v. *Maguire*, 310 Conn. 535, 556–58, 78 A.3d 828 (2013), wherein we held, inter alia, that it was improper denigration and belittling of the role of defense counsel for the prosecutor to describe the defense theory as "'smoke and mirrors,'" or to misrepresent the theory of defense as asking the jury to condone child sexual abuse.

We similarly disagree with the defendant that the prosecutor improperly made a "disdainful comparison of $10 to [Feuerstein's] stated hourly rate," or used cross-examination questions to create the image of the "defendant engaged in a murderous fight over $10 . . . ." In context, those questions appear intended to highlight the importance of $10 to the defendant and the victim, who were homeless men, and make the point that a relatively insignificant amount of money could motivate a homicide, thus providing an alternative explanation for Feuerstein's theory that the killing was an emotional response to sexual advances by the victim.[14] Nothing in this line of questions referred to Feuerstein's compensation specifically, but rather, simply highlighted the fact that the same sum of money might mean different things to persons of different economic circumstances.

In sum, these questions—although abrasively worded—are rooted in the evidence in the record and do not begin to approach the egregiousness of those at issue in *State* v. *Maguire*, supra, 310 Conn. 535. We conclude, therefore, that these questions did not amount to an improper personal attack on Feuerstein.

B

The Prosecutor's Disregard of Certain Court Orders

The defendant next claims that the prosecutor

improperly flouted numerous orders of the trial court while cross-examining Feuerstein. Specifically, the defendant challenges the prosecutor's apparent: (1) reference in front of the jury to the trial court's ruling holding certain of the defendant's medical records inadmissible for purposes of cross-examination; (2) disregard of the trial court's admonitions to phrase his questions to Feuerstein as hypotheticals, rather than assertions of fact; and (3) violation of a court order requiring the disclosure to the defendant of all uncharged misconduct evidence.

It "is well settled that prosecutorial disobedience of a trial court order, even one that the prosecutor considers legally incorrect, constitutes improper conduct."[15] *State* v. *Ortiz*, 280 Conn. 686, 704, 911 A.2d 1055 (2006). In many cases, however, this black letter principle is easier stated than applied. A prosecutor's advocacy obligations may occasionally drive him or her close to the line drawn by a trial court order regarding the use of certain evidence. See, e.g., *State* v. *Warholic*, supra, 278 Conn. 406–407 (prosecutor did not violate order precluding questions about substance abuse treatment, despite fact his questions about substance abuse itself resulted in warning from trial court that "this question concerning prejudicial and collateral matters put him 'a half a step away from a mistrial' "); *State* v. *Williams*, 102 Conn. App. 168, 181, 926 A.2d 7 ("[a]lthough the prosecutor may have gone to the edge of the court's order, we cannot say on the basis of the record before us that he deliberately violated the ruling or that he intended to undermine the authority of the court"), cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

Even when it is determined that a prosecutor has breached a trial court order, it can be difficult to distinguish between a mere evidentiary misstep and a potential due process violation. Our cases do, however, provide some guiding principles. Not every misstep by a prosecutor that exceeds the bounds of a trial court order rises to the level of prosecutorial impropriety that implicates a defendant's due process rights, thus requiring resort to the second step in the prosecutorial impropriety analysis. See *State* v. *Santiago*, 269 Conn. 726, 742, 850 A.2d 199 (2004) ("it is the severity of the misconduct, considered in the context of the specific facts and circumstances of a particular case, as opposed to the intrinsic nature of the impropriety, that determines whether an impropriety is evidentiary or of constitutional magnitude"); accord *State* v. *Gibson*, 302 Conn. 653, 663 n.4, 31 A.3d 346 (2011) (acknowledging that "there may be some overlap between the factors that the reviewing court considers when determining whether the prosecutor's conduct was improper and those that it considers when conducting its constitutional analysis").

Whether a prosecutorial question or comment that

runs afoul of a trial court order implicates a defendant's due process rights is a case specific determination. This determination turns on the degree to which the breach undermines a trial court's ruling that protects the integrity of the fact-finding process by restricting the admission of unreliable or unduly prejudicial evidence. See *State* v. *Maguire*, supra, 310 Conn. 558–60 (reference in objection to " 'full interview, and that's not in evidence' " in questioning expert about inconsistencies in victim's statement undermined decision for prosecutor and defendant to redact irrelevant portions of forensic interview transcript); *State* v. *Payne*, supra, 303 Conn. 565–66 (improper for prosecutor to link murder and jury tampering cases in summations when trial court stated it would not indicate that cases were legally related or permit prosecutor to argue that jury tampering was consciousness of guilt); cf. *State* v. *Ubaldi*, 190 Conn. 559, 573–74, 462 A.2d 1001 (unfair remark during summations asking jury to draw negative inference from witness' absence that "implied that the defendant was obligated to produce a witness whose invocation of his constitutional right made it impossible to present his testimony," particularly when that witness "had been identified as a 'bookie,' " thus "undermin[ing] the authority of the trial court's ruling that such a matter should not be considered by the jury"), cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).[16] To this end, a comment or question is more likely to rise to the level of constitutional impropriety when it raises the specter of a prosecutor improperly prejudicing the jury by interjecting his or her personal knowledge of facts beyond the record. See *State* v. *Maguire*, supra, 558–60. With this standard in mind, we turn to the defendant's specific claims of violations.

1

Reference to Medical Records Not in Evidence

Relying on *State* v. *Maguire*, supra, 310 Conn. 535, the defendant first contends that the prosecutor improperly asked a question that included a "stage whisper"[17] about the trial court's ruling that had deemed certain of the defendant's medical records inadmissible for purposes of cross-examination. Specifically, the challenged question by the prosecutor included this preface: "Okay. And now, the records aren't allowed to come in, but having . . . ." The state "does not dispute that this comment should not have been made," but contends that "the record is inadequate to determine whether this was truly an instance of prosecutorial impropriety or . . . merely a matter of an improperly phrased question and, therefore, simply a claim of evidentiary error." The state also contends that the remark was a "prefatory comment" that, when read in context, did not convey to the jury any " 'special knowledge' " about the content of the medical records. Moreover, the state contends that the jury was aware that the records had

not been admitted into evidence because it was present when the state made the original motion. We agree with the defendant, and conclude that this comment was improper—albeit not as singularly egregious as the comment identified in *Maguire*.

The record reveals the following additional relevant facts and procedural history. The trial court declined to admit the defendant's medical records into evidence on the ground that they were inadmissible under § 7-4 (b) of the Connecticut Code of Evidence because they were not facts relied upon by Feuerstein in forming his opinion. The prosecutor then asked Feuerstein:

"[The Prosecutor]: I'm asking you as a health-care professional, isn't it a good thing to get records that are very recent in time when trying to evaluate somebody's mental state?

"[Feuerstein]: Yes.

"[The Prosecutor]: Okay. *And now, the records aren't allowed to come in, but having—*

"[Defense Counsel]: I object, Your Honor. Ask that [it] be stricken.

"The Court: The jury should disregard that comment.

"[The Prosecutor]: Without talking to us about the specifics of what's in the records, are there items in there that you would have considered when rendering your opinion?"[18] (Emphasis added.)

We agree with the defendant that this comment, albeit prefatory, raised the specter of a "stage whisper" about materials contained in the medical records that the prosecutor knows might have some bearing on the case, but that the jury—for whatever reason—is not allowed to see. We recently held similar comments to be improper in *State* v. *Maguire*, supra, 310 Conn. 559, wherein a prosecutor made a comment during an objection to the defendant's cross-examination of a forensic interviewer about inconsistencies in the victim's statement, which referred to " 'the full interview, and that's not in evidence.' " We agreed with the defendant that this remark "indicat[ed] that redacted portions of the transcript of the forensic interview refuted defense counsel's assertion that [the interviewer] did not challenge the victim with respect to inconsistencies in the victim's claims against the defendant . . . ." Id., 558. We observed that this comment, among other improprieties committed by the prosecutor, "conveyed to the jury that the defendant or defense counsel was not to be trusted. As this court previously has stated, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently . . . may have access to matters not in evidence . . .

it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) Id., 562. Ultimately, on the record in *Maguire*, we concluded that this impropriety combined with others to deprive the defendant of his right to a fair trial. See id., 560–62. Accordingly, following *Maguire*, we conclude that this comment was an impropriety that will require us to determine whether it violated the defendant's right to a fair trial.

2

### Disregard of Hypothetical Questions Ruling

The defendant next argues that the prosecutor improperly questioned Feuerstein about whether people kill each other over seemingly minor triggers like $10 or parking spaces. See footnote 14 of this opinion. Specifically, the defendant, in his reply brief, appears to contend that these questions: (1) violated a trial court order against hypothetical questions not based on evidence in the record or the defendant's medical records; and (2) were not properly phrased as hypotheticals. In response, the state contends that, to the extent that the prosecutor violated the trial court's ruling concerning the questioning of Feuerstein, those violations were the inadvertent product of good faith attempts to formulate meaningful questions in response to a confusing and legally erroneous interpretation of § 7-4 (c) of the Connecticut Code of Evidence. Citing *State* v. *King*, 289 Conn. 496, 958 A.2d 731 (2008), the state observes that the "distinction between proper and improper questioning is often a subtle one." We agree with the state, and conclude that, to the extent that the prosecutor breached the trial court's evidentiary ruling concerning the use of hypothetical questions, his questioning did not rise to the level of prosecutorial impropriety that implicates the defendant's due process rights.

The record reveals the following relevant facts and procedural history. Following a chambers conference and subsequent argument on the record, the trial court addressed the use of "hypothetical questions asked on cross-examination" and ruled that, "[w]hile on direct examination, a hypothetical question needs to be based on facts in evidence. A greater latitude may be submitted on cross-examination. Accordingly, subject to the court's discretion in the cross-examination of an expert, any fact may be assumed in a hypothetical question to test the skill, learning, or accuracy of the expert or to ascertain the reasonableness . . . of the expert's opinion. The citation is *Floyd* v. *Fruit Industries, Inc.*, [144 Conn. 659, 666, 136 A.2d 918 (1957)].[19] So the cross-examination of the expert does not have to include facts that are . . . in evidence in general terms.

* * *

"So again, with respect to the hypothetical questions, as set out in the case law, the hypothetical question

because it's cross-examination can't have facts other than those that are not . . . in evidence as part of the hypothetical." (Footnote added.)

Following an objection by the defendant, the trial court later clarified that, under that ruling, the prosecutor was "not to . . . put into hypotheticals facts that are either not in evidence or part of the medical record. I heard nothing about killing someone for a spot—parking—that is in any way related to this case. Do you understand?"

The record discloses that the atmosphere in the courtroom at that point may have been tense, insofar as the trial judge deemed it necessary to admonish the prosecutor about raising his voice in court, leading the prosecutor to apologize and confirm the scope of the clarified order.[20] Nevertheless, we conclude that the prosecutor's questions, although phrased in apparent violation of the court's evidentiary ruling, did not rise to the level of an impropriety that is grist for the due process mill. The initial ruling that the trial court put on the record was not clear. Until the trial court's subsequent clarification emphasizing its restriction of hypotheticals to those rooted in facts either in evidence or contained in the defendant's medical records, that initial order contained somewhat confusing double negatives and, indeed, implicitly invited the use of extra-record facts in hypotheticals—which would not contravene *Floyd*, which was the basis for the trial court's ruling. The fact that the prosecutor's questions about small amounts of money or other trivial matters, such as parking spots, serving as a motive for killing led to a sustained objection because they crossed the initially hazy line drawn by the trial court does not raise those questions to the level of prosecutorial impropriety. See *State* v. *Sherman*, 38 Conn. App. 371, 386, 662 A.2d 767 (concluding that prosecutor's questions "did not directly undermine the court's ruling," despite fact that trial court "sustain[ed] the defendant's objection to the questions, it did so on the theory that the questions were similar to those meant to be precluded by the motion in limine," particularly because trial court gave prompt curative instruction to jury), cert. denied, 235 Conn. 905, 665 A.2d 905 (1995).

Further, to the extent that the defendant attacks the prosecutor's failure to indicate specifically that his questions were hypothetical in nature, we conclude that this was an error of form that did not undermine a ruling protecting against the admission of evidence that the trial court had specifically identified as substantively unreliable or unduly prejudicial. Accordingly, we conclude that these erroneously phrased questions did not rise to the level of constitutional prosecutorial impropriety.

### Breach of Orders with Respect to Uncharged Misconduct Evidence

The defendant next claims that the prosecutor improperly attempted to impeach Feuerstein's testimony with "several instances of misconduct [that] had not been disclosed in response to the defendant's pretrial pleading, and for which there was no basis in the record." The only misconduct that receives any substantive briefing, however, is the defendant's claim that the prosecutor improperly introduced evidence of his threat to stab someone 100 times with a knife, despite a ruling to the contrary. In an abundance of caution, and because they are intertwined, we also address the defendant's apparent challenge to cross-examination questions that asked Feuerstein whether he was aware of (1) the defendant's psychiatric hospitalization approximately one month before the homicide in this case "for threatening to kill or because he thought he was going to kill" O'Connor, and (2) an incident when the defendant's friends took a knife away from him because they were afraid he was going to hurt O'Connor. The defendant posits that, based on an initial preclusive order regarding the 100 times threat, these references were inappropriate because the prosecutor "had been warned well in advance that these references were inadmissible." The defendant also argues that the state failed to comply with an order granting the defendant's motion directing the state to disclose the uncharged misconduct that it intended to use.

In response, the state argues that the trial court's initial preclusive ruling was limited to the state's case-in-chief, rather than for impeachment purposes. The state also contends that the prosecutor's use of this uncharged misconduct evidence for impeachment purposes did not violate the terms of the court's order on the defendant's motion requiring the disclosure of uncharged misconduct evidence, which by way of its citation to *State* v. *Acquin*, 34 Conn. Supp. 152, 153, 381 A.2d 239 (1977), extended only to uncharged misconduct utilized to prove guilt, rather than for impeachment purposes. Contending that this misconduct did not become relevant until Feuerstein testified that the defendant had " 'no significant history of violence,' " the state also argues that the late disclosure by the defense of the voluminous medical records that had been reviewed by Feuerstein led to confusion on the part of the prosecutor about whether the knife incident was included in those records, and thus, was germane for cross-examination. We agree with the state, and conclude that any ostensible failure to comply with orders with respect to uncharged misconduct evidence did not rise to the level of constitutional prosecutorial impropriety.

We begin by reviewing the trial court's orders with respect to uncharged misconduct evidence. The defen-

dant filed a pretrial motion on November 28, 2011, "to require notice of uncharged misconduct evidence," seeking that "the state be ordered to provide defense counsel with a written statement listing the nature, date and place of any and all criminal offenses or acts of misconduct . . . ." (Citation omitted.) As legal authority for the motion, the defendant cited article first, § 8, of the Connecticut constitution, Practice Book § 40-12,[21] and *State* v. *Acquin*, supra, 34 Conn. Supp. 152. On December 14, 2011, the state filed a notice of uncharged misconduct stating, inter alia, that it might seek to admit: (1) "violent acts of the defendant . . . detailed" in the records disclosed by the defendant as relevant to the defendant's psychiatric defense; and (2) statements made in the presence of Peden in which the defendant "threaten[ed] to stab someone '[100] times.' "

When Peden testified during the state's case-in-chief, the prosecutor offered as uncharged misconduct evidence Peden's observation, recorded in his statement to the police, that, approximately one week before the homicide in this case, the defendant had waved a large knife around and said that: " 'I just [want to] stab someone [100] times.' " After some argument centered on whether that conduct constituted a crime, the trial court ruled that it would not permit the prosecutor to question Peden about that incident because it was not "misconduct" subject to § 4-5 (b) of the Connecticut Code of Evidence.

Subsequently, while cross-examining Feuerstein, the prosecutor asked him, inter alia, whether he was aware of (1) the defendant's psychiatric hospitalization approximately one month before the homicide in this case "for threatening to kill or because he thought he was going to kill" O'Connor, and (2) that the defendant's friends had to take a knife away from him because they were afraid he was going to hurt O'Connor. See footnote 9 of this opinion. This line of questioning led to a multifaceted objection from the defendant.[22]

Having reviewed the parties' briefs and the record, we conclude that this claim is really a discovery dispute that does not rise to the level of constitutional impropriety. First, there is no constitutional right to the disclosure of uncharged misconduct evidence, which is inculpatory in nature. See, e.g., *State* v. *Colon*, 71 Conn. App. 217, 241, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). Second, our review of the record demonstrated that the state had indicated in its disclosure that it would rely on episodes of misconduct contained in the medical records reviewed by Feuerstein, and the prosecutor's belief that the episodes at issue were reflected in those records. Further, given the citation to *State* v. *Acquin*, supra, 34 Conn. Supp. 152, in the defendant's motion for disclosure, the prosecutor's argument that he was not required to disclose materials beyond those used in the case-in-chief was

not frivolous or unreasonable. See id., 152–53 (noting that motion at issue in *Acquin* sought disclosure of uncharged misconduct evidence "other than those charged in the present information and those offered for impeachment purposes, which the state will attempt to prove at the trial"). Finally, even after extensive argument, and the denial of a motion for a mistrial that, in part, was based on the defendant's claims of untimely disclosure of this evidence, the trial court did not sanction the state or indicate any displeasure with the disclosure provided. Instead, the trial court, focusing on its order that the questioning of Feuerstein be conducted through the use of hypotheticals, instructed the jury that the questions were not evidence and that the jury had "heard no evidence that the defendant threatened to kill or stab [O'Connor]." Accordingly, given the lack of clarity in the record on this point, we conclude that the defendant has failed to establish that any breach by the prosecutor with respect to the disclosure of uncharged misconduct rose to the level of constitutional impropriety.

## C

## Closing Argument Impropriety

Finally, the defendant challenges certain aspects of the state's closing and rebuttal arguments. In particular, the defendant challenges the prosecutor's arguments that: (1) "common sense tells you that the version of events that [the defendant] gives just doesn't make sense. There's nothing corroborating his statement that there were unwanted sexual advances"; and (2) the "defendant in the beginning tried to immediately set up a motive or an excuse as to why it was that he committed this crime. What he says does not make sense." The defendant argues that these comments were "improper rhetoric [that] was a direct pick up from the prosecutor's sarcasm, incredulity, and disdain during cross-examination" that amounted to an "unfair [appeal] to emotion and prejudice."[23] (Internal quotation marks omitted.) In response, the state relies on *State* v. *Long*, 293 Conn. 31, 975 A.2d 660 (2009), and contends that these statements were not improper because a prosecutor may argue credibility and appeal to the jurors' common sense during summations, as long as the arguments are rooted in the evidence in the record. We agree with the state, and conclude that the prosecutor did not commit impropriety during closing arguments.

"The parameters of the term zealous advocacy are . . . well settled. . . . [A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may

induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . However, [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citation omitted; internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 40–41, 100 A.3d 779 (2014).

Further, it "is well established that a prosecutor may argue about the credibility of witnesses, as long as her assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom. . . . Moreover, [i]n deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks. . . . Our jurisprudence permits these statements from the prosecution, if properly presented . . . ." (Citation omitted; internal quotation marks omitted.) Id., 45–46; see also, e.g., *State* v. *Long*, supra, 293 Conn. 41–42. The prosecutor may also make these arguments with respect to the credibility of statements by the defendant himself, so long as they are rooted in the evidence at trial. See, e.g., *State* v. *Medrano*, 308 Conn. 604, 616–19, 65 A.3d 503 (2013) (prosecutor properly argued defendant was not credible because of evidence that he had larceny conviction and had lied on job application, and had motive to lie); see also *State* v. *Smalls*, 78 Conn. App. 535, 542–43, 827 A.2d 784 (prosecutor may properly comment on defendant's "voluntary pretrial statements if the defendant relies on those statements for a defense" and comment does not burden defendant's right not to testify), cert. denied, 266 Conn. 931, 837 A.2d 806 (2003).

Finally, in evaluating claims of impropriety during summation, we recognize that "the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . ." (Internal quotation marks omitted.) *State* v. *Albino*, supra, 312 Conn. 772. "When making closing arguments to the jury . . . [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel

in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 611.

Read in context, we conclude that the prosecutor's arguments that the defendant's statement and theory did not "make sense" were not improper. Specifically, the prosecutor cited ample evidence from the trial record to establish that the defendant was not homophobic—let alone violently so. The prosecutor, therefore, properly argued that the defendant's extreme emotional disturbance defense, as rooted in deep homophobia, "did not make sense" given the evidence in the record "that he acted exactly the opposite of someone who would be homophobic," by maintaining friendships with openly gay men and by not reacting negatively to a same sex sexual encounter that he had at a party. See footnote 31 of this opinion. Accordingly, we conclude that the challenged remarks during closing argument were not prosecutorial impropriety.

## D

### *Williams* Due Process Analysis

Having identified two instances of impropriety during cross-examination, namely, the prosecutor's description of the defendant as a "mean and nasty person who was looking to kill somebody," and his reference to the records that the trial court had declined to admit; see parts I A 1 and I B 1 of this opinion; we now determine whether they violated the defendant's right to a fair trial. "[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the impropriety to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"We recently clarified that when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 57–58.

Reviewing the six *Williams* factors, we agree with

the state and conclude that the two identified improprieties did not deprive the defendant of his right to a fair trial. We acknowledge that the defendant did nothing to invite them, and, in fact, thought both significant enough to warrant both an objection when made and later serve as a partial basis for a mistrial motion. See also part II of this opinion. Nevertheless, these two improprieties were confined to the cross-examination of Feuerstein and, therefore, were not frequent. Second, they also were not particularly severe, especially when contrasted with the more vituperative language considered in some of our other cases; see footnote 10 of this opinion; and the more focused stage whisper at issue in *State* v. *Maguire*, supra, 310 Conn. 558–60, wherein the prosecutor directly highlighted the existence of redacted portions of records while questioning an expert about inconsistencies in those records that had been admitted into evidence. Third, the improprieties were not particularly central to the state's case against the defendant or its attempt to refute the special defense—the prosecutor did not address Feuerstein's testimony at all during closing or rebuttal arguments. Fourth, the state's case against the defendant as explained during summations—including with regard to responding to the defendant's extreme emotional disturbance defense—was very strong and rooted largely in the defendant's own statement and the gravity and severity of the victim's injuries. Finally, to the extent there was any harm, it was mitigated by the trial court's prompt curative instruction directing the jury to disregard the improper questions, which we presume the jury followed. See, e.g., *State* v. *Payne*, supra, 303 Conn. 567–68; *State* v. *Warholic*, supra, 278 Conn. 404. Accordingly, we conclude that these two isolated instances of prosecutorial impropriety did not deprive the defendant of a fair trial and, therefore, do not warrant reversal of this conviction.[24]

## II

## MISTRIAL MOTIONS

We next address the defendant's claim that the trial court improperly denied his two motions for a mistrial based on the improper presentation of uncharged misconduct evidence. The defendant contends that the trial court should have granted his motions for a mistrial upon: (1) a spontaneous statement by Richard Innaimo, a Waterbury police detective, that he had utilized "a booking photo[graph] with a physical description from a previous arrest" to aid in apprehending the defendant; and (2) the prosecutor's use of assertions of fact, rather than hypothetical questions, to cross-examine Feuerstein about prior misconduct by the defendant such as threats to kill O'Connor and his friends taking a knife away from him.[25] In response, the state argues that the trial court did not abuse its discretion in determining that striking the challenged

evidence and issuing a curative instruction was an adequate remedy short of declaring a mistrial. We agree with the state, and conclude that the trial court did not abuse its discretion by denying the defendant's motions for a mistrial.

The record reveals the following additional relevant facts and procedural history.[26] Innaimo testified that he had been assigned to assist with the apprehension of the defendant by the Waterbury police. The prosecutor asked Innaimo whether he had "look[ed] at any type of photograph or learn[ed] any other biological information about" the defendant prior to going out to look for him. Innaimo then responded that he "had a booking photo[graph] with a physical description from a prior arrest." After Innaimo testified about the events concerning the apprehension of the defendant, the defendant asked to be heard outside the presence of the jury, and moved for a mistrial, arguing that the "inquiry and response in regards to the identification of the defendant through a booking photo[graph] from a previous arrest is completely inappropriate." The defendant stated that he had not objected at the time because he did not want to draw more attention to Innaimo's comment. In response, the prosecutor argued that she had not anticipated Innaimo's answer, but contended that prejudice would be mitigated by testimony anticipated from Feuerstein regarding the defendant's prior larceny arrest. After additional discussion, the trial court denied the defendant's motion for a mistrial, deeming it a "severe sanction" that was not warranted in light of the availability of a curative instruction, to be given both at that time and reiterated later during the final charge.[27]

Subsequently, an evidentiary dispute arose about the potential introduction of evidence of uncharged misconduct during the cross-examination of Feuerstein via questions phrased as assertions of fact, rather than as hypotheticals. See part I B 2 of this opinion. Defense counsel renewed his previous motion for a mistrial arising from Innaimo's reference to a booking photograph, and stated, "at this point, the court is not just looking at that one isolated statement," arguing that "it's the cumulative nature of a variety of things that have occurred that, in my opinion, are beyond any instruction the court can give" with respect to preserving the defendant's right to due process and fundamental fairness. The defendant again challenged the prosecutor's "mean and nasty person" question; see part I A 1 of this opinion; and the phrasing of questions using assertions of fact rather than hypotheticals, in particular the questions about the defendant's threats toward O'Connor, and the fact that his friends had to take his knife away. In response, the prosecutor argued that the "mean and nasty person" comment was an alternative theory for the homicide, and that the evidence of the defendant's threatening behavior was rooted in his medical records.

After ruling on the hypothetical phrasing, the trial court denied the mistrial motion, stating that the jury would be instructed that the prosecutor's statements were not evidence, and those references would be stricken from the record. The trial court then instructed the jury accordingly.[28]

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 280 Conn. 702. Further, in "reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) Id., 703.

As previously discussed in part I B 2 of this opinion, we conclude that the prosecutor's breach of the trial court's evidentiary ruling by questioning Feuerstein using assertions of fact, rather than hypotheticals, to describe certain instances of prior misconduct, did not implicate the defendant's due process rights. We also conclude that the brief reference to the booking photograph, while unfortunate, was not excessively prejudicial because neither the prosecutor nor Innaimo dwelt on that point, and there was mention of the crime that formed the basis for the arrest. The trial court, therefore, reasonably could have concluded that any prejudice to the defendant, including that created by the "mean and nasty person" comment, would be addressed adequately by a curative instruction. Accordingly, we conclude that the trial court did not abuse its discretion by denying the defendant's various motions for a

mistrial.

### III

### SUFFICIENCY OF THE EVIDENCE

We next address the defendant's claim that there is insufficient evidence to support his conviction for kidnapping in the second degree, which serves as the predicate for his felony murder conviction. Relying on, inter alia, *State* v. *Salamon*, supra, 287 Conn. 509, and *State* v. *Ward*, 306 Conn. 718, 51 A.3d 970 (2012), the defendant contends that there is insufficient evidence to establish beyond a reasonable doubt that there was confinement or movement of the victim beyond that incidental to the commission of another crime, in this case, murder.[29] In response, the state, citing *State* v. *Ward*, supra, 718, and *State* v. *Miranda*, 145 Conn. App. 494, 75 A.3d 742, cert. granted on other grounds, 310 Conn. 942, 79 A.3d 894, cert. denied, 310 Conn. 942, 79 A.3d 893 (2013), contends that the kidnapping conviction is supported by the defendant's admission that he wanted to torture the victim, as evinced by the length of confinement and his acts of moving the victim to numerous locations within the factory before ultimately killing him. We agree with the state, and conclude that the defendant's kidnapping conviction is supported by sufficient evidence.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 311 Conn. 408, 419, 87 A.3d 1101 (2014); see also id., 419–20 (setting forth more detailed recitation of standard).

"[I]n *State* v. *Salamon*, supra, 287 Conn. 542, this court reconsidered its prior interpretation and construction of the kidnapping statutes and concluded that [o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime.

"Although our holding in *Salamon* constituted a significant change with respect to our interpretation of the kidnapping statutes, we emphasized that [o]ur holding does not represent a complete refutation of the principles established by our prior kidnapping jurisprudence.

First, in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. [T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . . In other words, the test . . . to determine whether [the] confinements or movements involved [were] such that kidnapping may also be charged and prosecuted when an offense separate from kidnapping has occurred asks whether the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution." (Internal quotation marks omitted.) *State* v. *Ward*, supra, 306 Conn. 731–32; see also *State* v. *Salamon*, supra, 287 Conn. 547–48 (describing factors jury should consider in determining whether "restraint was not merely incidental to the commission of some other, separate crime" [emphasis omitted]).

Based upon the facts in the record and the reasonable inferences that they support, we conclude that sufficient evidence underlies the defendant's conviction of second degree kidnapping. Consistent with the defendant's desire that the victim "suffer and be tortured," there was sufficient evidence under which the jury could have found beyond a reasonable doubt that the defendant's movement and confinement of the victim was not merely incidental to the crime of murder, insofar as he engaged in conduct beyond that necessary to hold the victim down and stab him to death. Specifically, in a protracted altercation, the defendant prevented the victim's escape from the attack and forced him at knifepoint to move among the various floors of the factory building before they ended up on the third floor, where the defendant forced the victim through the larger hole in the floor, beat him with a broken fluorescent light tube, and stabbed him to death. The nature and length of this encounter across multiple locations in the factory supports the jury's verdict convicting the defendant of second degree kidnapping. See *State* v. *Ward*, supra, 306 Conn. 736–39 (sufficient evidence of kidnapping when defendant dragged victim at knifepoint from kitchen to bedroom where he moved her from bed to floor for sexual assault because that act made victim's "possibility of escape even more remote," and sexual assault was brief part of entire fifteen minute encounter); *State* v. *Salamon*, supra, 287 Conn. 549–50 (defendant not entitled to acquittal of kidnapping charge when he subdued victim and forcibly held her down for at least five minutes in addition to acts of assaulting her by striking her and forcing his fingers

into her mouth); *State* v. *Miranda*, supra, 145 Conn. App. 513 (sufficient evidence of kidnapping when victim was moved from second floor to first floor of apartment where murder took place, with victim's bruises and lacerations supporting inference that "the defendant, before committing the murder, subjected [the victim] to a period of physical abuse, which required additional confinement"). Accordingly, we conclude that the jury's verdict that the defendant committed second degree kidnapping was supported by sufficient evidence.

IV

PRECLUSION OF DEFENSE WITNESSES

The defendant's final claim is that the trial court improperly barred the testimony of two witnesses who would have corroborated aspects of his extreme emotional disturbance defense, specifically: (1) Christopher Veader, the defendant's brother, who would have testified about child sexual abuse in their family; and (2) Rene Ingram, who would have testified to a same sex sexual encounter with the victim. The defendant contends that the trial court's order: (1) was an improper grant of an oral motion in limine in violation of Practice Book § 42-15;[30] and (2) "emasculated the defendant's defense and his constitutional rights" by barring "vital corroborative testimony . . . ." In response, the state argues, inter alia, that: (1) the defendant's § 42-15 claim is not preserved; (2) his constitutional claim is inadequately briefed; and (3) the trial court reasonably could have barred the testimony of both witnesses as irrelevant or cumulative. We agree with the state that the defendant's evidentiary claims are not reviewable, inadequately briefed, or otherwise lack merit.

The record reveals the following additional relevant facts and procedural history. During trial, the defendant advised the trial court that the anticipated testimony of Veader and Ingram presented issues to be resolved outside the presence of the jury. The defendant proffered Veader to testify that he had been sexually abused by their stepfather in a place and manner similar to that endured by the defendant, and was aware that the stepfather had abused the defendant as well. The state objected to Veader's testimony as hearsay because he had not witnessed the molestation of the defendant, as irrelevant given that the defendant did not personally see his abuse as contributing to the homicide, and as cumulative of the testimony of Feuerstein and O'Connor. The defendant argued in response that he would not elicit hearsay testimony from Veader and that his sexual abuse was "reasonably part of what [Feuerstein] considered." After Veader testified in an offer of proof, the trial court excluded Veader's testimony as both irrelevant and hearsay not subject to the residual exception; see Conn. Code Evid. § 8-9; because it was neither necessary nor supported by "equivalent guarantees of trustworthiness . . . ."

The defendant proffered Ingram to testify about a same sex sexual encounter with the victim after a party in 1991, eighteen years prior to the victim's death. The defendant argued that Ingram's testimony would establish that the victim was gay and had solicited sexual acts, thus supporting the theory of his defense. After Ingram testified in an offer of proof, the trial court excluded that testimony, concluding that the incident was "too remote in time" and "could lead to confusion on the part of the jury."

The defendant's claims arising from the exclusion of the testimony of Veader and Ingram warrant only brief discussion. First, we agree with the state that the defendant's claim that the trial court improperly granted what was in essence an oral motion in limine in violation of Practice Book § 42-15, which requires such motions to be in writing, was not raised before the trial court. Further, the defendant has not supplied analysis in his brief indicating that this specific claimed lapse in the rules of practice requires reversal under the plain error doctrine; see Practice Book § 60-5; or, put differently, "is such an obvious error that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 291, 963 A.2d 11 (2009); see also id., 290 ("[a] trial court's failure to comply with a rule of criminal procedure, without more, is insufficient to require reversal for plain error"). Accordingly, we decline to review this claim.

Second, to the extent the defendant's brief addresses the trial court's evidentiary rulings, it is largely inadequate. Although the defendant cites and quotes numerous authorities on the topics of relevance, hearsay, and the residual exception of § 8-9 of the Connecticut Code of Evidence in an abstract manner, he does not specifically analyze the trial court's ruling that Veader's testimony was inadmissible hearsay not subject to the residual exception by applying law to fact. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003); see also, e.g., *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 194 n.4, 3 A.3d 56 (2010) ("[b]ecause the plaintiffs do not cite any authority or develop their claim with analysis, we conclude that the claim is inadequately briefed"). We therefore will not address the defendant's claim to the extent it poses an evidentiary challenge to the trial court's decision to exclude Veader's testimony.

Insofar as the defendant's brief adequately addresses the trial court's determination that Ingram's testimony was irrelevant, we disagree with his arguments. "[R]elevant evidence is evidence that has a logical tendency

to aid the trier in the determination of an issue. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . The trial court has wide discretion to determine the relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Kalil*, 314 Conn. 529, 540–41, 107 A.3d 343 (2014). We agree with the state that the trial court did not abuse its discretion in determining that Ingram's testimony about a single same sex sexual encounter eighteen years prior to the homicide was irrelevant, particularly when the state did not purport to challenge the defendant's assertion that the victim was homosexual.[31] As the state aptly observes, "the victim's mere status as a homosexual is no more probative of whether he is likely to have engaged in nonconsensual sexual acts with another person than would a defendant's mere status as a heterosexual be probative of such a tendency." Accordingly, we conclude that the trial court did not abuse its discretion in determining that Ingram's proffered testimony was irrelevant.

Finally, because the defendant has failed to establish that these evidentiary rulings by the trial court on the basis of hearsay and relevance were improper, he cannot establish that they deprived him of his sixth amendment right to present a defense, which is an unpreserved claim that he raises pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . .

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Thus, our law is clear that a defendant may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Tutson*, 278 Conn. 715, 748, 899 A.2d 598 (2006). Accordingly, because the defendant has failed to establish that the trial court improperly excluded the testimony of Veader and Ingram, he similarly cannot establish that the exclusion violated his right to present a defense, and his claim fails under the third prong of

*Golding.* See, e.g., *State* v. *Crespo*, 303 Conn. 589, 614, 35 A.3d 243 (2012); *State* v. *Davis*, 298 Conn. 1, 10, 1 A.3d 76 (2010); *State* v. *Tutson*, supra, 750–51.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER, ZARELLA, McDONALD and VERTEFEUILLE, Js., concurred.

[1] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] We note that although § 53a-54a was amended in 2012; see Public Acts 2012, No. 12-5, § 7; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] Wayne Carver, the state's chief medical examiner, determined that the multiple stab wounds had injured major blood vessels and organs, including the heart, lungs, and liver, causing the victim's death.

[4] Feuerstein based his conclusion on information derived from three meetings with the defendant, a conversation with a family member of the defendant, and the review of numerous documents, including medical records and the court and police files in this case. Feuerstein testified that the nature of the victim's multiple stab wounds, along with the defendant's attempts to calm himself down by smoking marijuana prior to the attack, indicated that the attack was "the outcome of an extreme release of emotion" beyond a simple desire to kill the victim. Feuerstein testified that the defendant had a "significant history of violence" and psychiatric hospitalizations as an adolescent, although there was no evidence that he "would be capable of this . . . level of violence." Feuerstein also testified that the defendant had been the victim of sexual abuse as a child by his stepfather. Feuerstein then related the defendant's increasing discomfort with the victim in the days and weeks leading up to the attack, although he acknowledged that the defendant had not previously acted violently toward gay people.

[5] Following this court's decision in *State* v. *Lewis*, 245 Conn. 779, 819, 717 A.2d 1140 (1998), the trial court merged the defendant's convictions of felony murder and murder, and vacated the defendant's sentence on the felony murder count.

[6] The defendant's trial was prosecuted by two senior assistant state's attorneys assigned to the Waterbury judicial district, namely, Terrence Mariani and Amy Sedensky. The defendant's prosecutorial impropriety claims arising from the questioning of Feuerstein solely concern the actions of Attorney Mariani, while his claims arising from the summation and rebuttal arguments solely challenge the actions of Attorney Sedensky. For the sake of simplicity, all references to the prosecutor are phrased in the singular.

[7] We note that the defendant's briefing of the prosecutorial impropriety issue is both confusing and incomplete. In particular, the defendant's principal brief does not contain legal analysis corresponding to each of the prosecutorial questions or remarks identified in its statement of additional relevant facts. To the extent that this opinion does not address any particular claimed impropriety, it is because we consider those claims to be inadequately briefed. We also note, however, that the defendant has provided brief legal analysis with respect to some of those additional improprieties in his reply brief. Notwithstanding our general refusal to address claims that are briefed in this manner; see, e.g., *State* v. *Devalda*, 306 Conn. 494, 519 n.26, 50 A.3d 882 (2012); we exercise our discretion to review them on their merits in the present case because the state has responded to those claimed improprieties and, therefore, has not been prejudiced by this manner of briefing.

[8] "Once prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding*." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 434 n.7, 64 A.3d 91 (2013).

[9] In context, after discussing the defendant's hospitalization in 2003, when he was approximately fifteen years old, the prosecutor "jump[ed] forward to" June, 2009, and asked Feuerstein a lengthy series of questions about his awareness of the defendant's psychiatric history leading up to the time of the attack on the victim, including about whether the defendant had been candid about certain hospital visits occasioned by threatening behavior. The prosecutor asked Feuerstein, inter alia, whether the defendant's failure to discuss those instances created "some concern about the reliability of the

information that he conveyed to you." The following colloquy then occurred:

"[Feuerstein]: I always felt and always feel in cases like this that I don't always have 100 percent of the information. I knew that the information I got from him wouldn't be 100 percent reliable. I feel that compared to other similar situations, his story meshed very consistently with the other versions I had. If I had asked him about emergency room visits, he may have told me, but I didn't—and I don't have a recording of my session with him, so I can't explicitly say.

"[The Prosecutor]: Would . . . your impressions of him based on your interviews . . . change in any significant way if you knew that just weeks before this homicide his friends had to take the knife away from him so that he didn't go and stab his girlfriend?

"[Feuerstein]: Is the question would I be surprised?

"[The Prosecutor]: No, would that [a]ffect your impression of him based upon your interviews? No, it seems to me—

"[Feuerstein]: Well, it would have . . . made me think about possible underlying psychiatric diagnoses. It would be inconsistent with him wanting to kill this person. But I guess, generally speaking, he has no history of violence. So . . . it's not irrelevant is what I'm saying, but it wouldn't change my impression.

"[The Prosecutor]: Would it be a fact that you would have wanted to know about before you came in here and testified about what may or may not have been going through his mind back around the time this was happening?

"[Feuerstein]: Yeah, I would have explored it in more detail.

"[The Prosecutor]: Sure. *Because, I mean, maybe he's just a mean and nasty person who was looking to kill somebody.*

"[Defense Counsel]: Objection, Your Honor.

"The Court: Sustained. The jury should disregard the question.

"[The Prosecutor]: Would you be interested in the fact that he was making threats to kill other people around the time that he killed [the victim]? Wouldn't that inform your opinion about what was going through his head at the time of this particular murder?

"[Feuerstein]: It would have been data that would have been useful and been worth exploring, yes." (Emphasis added.)

[10] The defendant responds to the state's argument contextualizing the "mean and nasty" remark by asking whether "there [is] a way to call someone 'mean and nasty' as a compliment?" It bears noting that the phrase "mean and nasty" is relatively tame in the grand scheme of the invective considered in our voluminous prosecutorial impropriety jurisprudence. See, e.g., *State* v. *Williams*, supra, 204 Conn. 546–47 (prosecutor called defendant, inter alia, " 'child-beater,' 'baby-beater' and 'infant-thrasher,' " as well as " 'a liar,' 'drunken drug-user, convicted felon, child beater,' " and referred to principal defense witness as " 'liar,' 'stupid,' an 'evil woman,' and an 'evil, terrible woman' "); *State* v. *Couture*, 194 Conn. 530, 560–61, 482 A.2d 300 (1984) (prosecutor described defendants as " 'murderous fiends,' 'rats,' 'utterly merciless killers' and 'inhumane, unfeeling and reprehensible creatures' "), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Nevertheless, the relative severity of the improper comment is a factor to be considered in the ultimate due process analysis. See part I D of this opinion.

[11] Thus, we disagree with the defendant's reliance on *State* v. *Heredia*, 253 Conn. 543, 565, 754 A.2d 114 (2000), and *State* v. *Warholic*, supra, 278 Conn. 354, wherein this court deemed the challenged prosecutorial remarks to be improper emotional appeals intended to invoke the fears of the jury. See *State* v. *Warholic*, supra, 374–75 (The prosecutor stated: " 'The evidence proves that [the defendant] is the child molester that he's accused of being. They're out there. They're among us.' " [Emphasis omitted.]); *State* v. *Heredia*, supra, 558 (prosecutor challenged defendant's attempts to appear naive and harmless in court by saying that: " '[i]f I loaded that gun and shut out the lights in this courtroom and put it in his hand, I think everybody would have a very different perception of how dangerous he is' " [emphasis omitted]). *Heredia* and *Warholic* are inapposite because the defendant's identity as the perpetrator of the offenses charged was at issue therein; in the present case, it was uncontested that the defendant committed the homicidal act at issue.

[12] We respectfully disagree with the concurring justice's opinion that the "mean and nasty person" comment "was not gratuitously pejorative, but rather an inartful and poorly crafted expression within a valid line of questioning," and that "the prosecutor's otherwise entirely proper and on point comment is improper simply due to words he happened to employ while under the pressure of cross-examining a witness." Although we recognize that the process of an attorney, or judge, thinking quickly on their feet at trial might lead to remarks that seem regrettable on later review in a printed

transcript, and that we do not want to supplant zealous advocacy with, as the concurring justice calls it, "overcautious and ineffective advocacy," we nevertheless emphasize that the prosecutor has a greater systemic and official responsibility to seek impartial justice than does an ordinary advocate, and that whether an impropriety is intentional or accidental does not affect whether it deprived a defendant of a fair trial. See, e.g., *State* v. *Angel T.*, 292 Conn. 262, 282 n.14, 973 A.2d 1207 (2009) ("[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor" [internal quotation marks omitted]).

Further, in a comment on the apparent proliferation of prosecutorial impropriety claims in criminal appeals; see, e.g., *State* v. *Jarrett*, 82 Conn. App. 489, 501, 845 A.2d 476 ("[p]rosecutorial misconduct has become the criminal equivalent of the [Connecticut Unfair Trade Practices Act] claim" [footnote omitted]), cert. denied, 269 Conn. 911, 852 A.2d 741 (2004); the concurring justice expresses her concern that "lightly labeling minor prosecutorial missteps as improper also undermines the seriousness of claims brought by those defendants that have experienced egregious violations of their constitutional rights due to improper prosecutorial behavior." To this end, the concurring justice also observes that treating apparently minor missteps as improper "serves to diminish the gravity with which an appellate court should evaluate severe prosecutorial improprieties and cheapens claims of seriously prejudicial due process violations." We respectfully disagree. The well settled principles under which we consider prosecutorial impropriety claims do not treat all claims of impropriety as equal insofar as they accommodate both for the severity of the impropriety and its relative effect in any given case in determining whether reversal is required. See, e.g., *State* v. *Ciullo*, 314 Conn. 28, 57–58, 100 A.3d 779 (2014); see also part I D of this opinion. Whether, given these principles, a prosecutorial impropriety claim is an effective strategic use of limited briefing space in a given criminal appeal is a question that is the prerogative of appellate defense counsel, rather than this court, to answer.

[13] The full context of this exchange between the prosecutor and Feuerstein was as follows:

"Q. . . . You would agree with me, wouldn't you, *that the substance of your testimony here is not really based on any hard science*. Fair enough to say?

"A. It depends on what you mean by 'hard science.'

"Q. Did you have any data that supports your conclusions?

"A. Well, clinical evaluations rely on a lot of data.

"Q. Okay. Well, let me ask this: Did you administer any science—any test to him, any personality tests?

"A. No.

"Q. And those are part of the psychiatric arsenal, so to speak, like the [Minnesota Multiphasic Personality Inventory], Rorschach tests—there's a whole battery of tests that psychiatrists use to evaluate people. Is that true?

"A. If they're relevant, yes.

"Q. Okay. Were any of those tests given to him?

"A. No." (Emphasis added.)

[14] This question arose in the following context:

"[The Prosecutor]: Sure. Now, I want to ask you just a little bit about didn't [the defendant] indicate in his statement that there was a fight between the two of them over money?

"[Feuerstein]: I really thought the fight was about not purchasing beer, but I . . . guess it could be interpreted as a fight over money.

"[The Prosecutor]: Well, let's take it step-by-step. Did he tell you and were you aware that in the records supposedly [the victim] gave the defendant $10 to go purchase beer? . . .

"[Feuerstein]: Yes. Yes, I was aware of that.

"[The Prosecutor]: Sure. And that he didn't go buy the beer?

"[Feuerstein]: Yes.

"[The Prosecutor]: He went and bought marijuana for himself?

"[Feuerstein]: Yes.

"[The Prosecutor]: And you're aware of the fact that these people are homeless, right?

"[Feuerstein]: Yes.

"[The Prosecutor]: So $10 might mean kind of a little bit more to them than somebody who's getting $300 an hour, right? I mean, $10 could be a lot of money?

"[Feuerstein]: He was buying a beer with it. He was supposed to buy a beer.

"[The Prosecutor]: Sure, but he didn't buy the beer.

"[Feuerstein]: No, but I guess my point is . . . the level of importance . . . I would relate to what the money was to be spent on. Had it . . . been I was to get food because we were starving is very different than go to the

store and get a beer, so . . . both the facts and the way he described it seemed to indicate—and by facts I mean the police reports and other iterations which, as you point out, come from the defendant's mouth—didn't seem to indicate that the money was to be spent on some particularly important item whether you're rich or poor.

"[The Prosecutor]: Okay. Let me ask you if you can agree with this: That potentially one of the disagreements between the two of them [was] the spending of that $10?

"[Feuerstein]: Yes.

"[The Prosecutor]: Okay. Did you ask him if the fight was about that?

"[Feuerstein]: I didn't have to because he acknowledged that he didn't buy it and he let [the victim] know he didn't buy it when he got back, so it was clear that that was . . . an entry point to the discussion about whether or not he had, in fact, sexually violated him. He . . . described it, that it was part of the argument, so . . . it didn't have to be—I'm not sure if I'm not being clear, but he . . . just acknowledged that he didn't buy it and that he went back and told him he didn't buy it.

"[The Prosecutor]: Did you say to him, how do we know the fight wasn't about the $10?

"[Feuerstein]: . . . The facts of the eventual outcome don't in any way relate to . . . an argument even among very poor people over $10.

"[The Prosecutor]: . . . Well, let me ask you this: Have you heard about people killing each other over parking spaces? You've heard of that, right?

"[Feuerstein]: Yes.

"[The Prosecutor]: I mean, the fact that $10 is a—

"[Feuerstein]: I'm not sure it happens, but I've heard people say it.

"[The Prosecutor]: Sure. [Ten dollars] may not be a good reason to get in a fight where you end up killing somebody, but it happens, right?

"[Feuerstein]: You know . . . I guess it can happen.

"[The Prosecutor]: Sure. And I guess what I'm—

"[Defense Counsel]: Your Honor, I'd object. That's an inappropriate statement. These are gratuitous comments that are not questions. They should be disregarded by the jury.

"The Court: Sustained. The jury should disregard that question.

"[The Prosecutor]: I'm asking you this: Did you consider that the motivation for this murder was a fight over the $10 and not this—

"[Feuerstein]: I . . . considered any—

"[The Prosecutor]: I'm not finished, please—and not this claim of sexual abuse?

"[Feuerstein]: Yes, I considered it could have been any number of things.

"[The Prosecutor]: And did you push him on that?

"[Feuerstein]: I'm not sure what you mean by push him on that.

"[The Prosecutor]: Hey, come on. It was about the $10. It wasn't about that."

[15] Prosecutorial disobedience of court orders may result in reversal of a defendant's conviction on either of two doctrinal grounds. First, the disobedience may result in a due process violation that deprives the defendant of his right to a fair trial. Alternatively, the disobedience, if done deliberately or in bad faith, may justify reversal as a sanction pursuant to the appellate courts' supervisory powers. See, e.g., *State* v. *Warholic*, supra, 278 Conn. 406–407 and 407 n.30; *State* v. *Ubaldi*, 190 Conn. 559, 570–73, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). For additional discussion of reversal pursuant to our supervisory powers, see footnote 24 of this opinion.

[16] See also, e.g., *State* v. *McLaren*, 127 Conn. App. 70, 81–82, 15 A.3d 183 (2011) (improper for prosecutor to ask about specific inculpatory comment in police report, and refer to it during summations, when trial court had granted motion in limine deeming that comment highly prejudicial double hearsay); *State* v. *Jose G.*, 102 Conn. App. 748, 767–68, 929 A.2d 324 (2007) (prosecutor improperly violated court orders barring questions about "Sirchie" rape kit because no such kit had been used in case, but violations, which occurred several times during trial, were not frequent or severe), aff'd, 290 Conn. 331, 963 A.2d 42 (2009); *State* v. *Dews*, 87 Conn. App. 63, 79–80, 864 A.2d 59 (use of stricken testimony resulting from "confusion or mistake" not impropriety), cert. denied, 274 Conn. 901, 876 A.2d 13 (2005).

[17] A stage whisper is "a loud whisper by an actor that is audible to the spectators but is supposed for dramatic effect not to be heard by one or more of the actors . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003).

[18] In full context, we note that the state attempted to admit into evidence certain medical records arising from the defendant's visit to the Waterbury Hospital emergency room in May, 2009, and then question Feuerstein about whether their content would affect his opinion of the defendant. The trial court sustained the defendant's objection to these records, but ruled that it would afford the state some "leeway on the cross-examination" because

the records had been disclosed by the defendant to the state, albeit not reviewed by Feuerstein. The challenged exchange occurred shortly thereafter.

[19] In *Floyd*, this court considered the trial court's authority to permit hypothetical questions of expert witnesses, and concluded that "[t]he determination of the admissibility of a hypothetical question, at least except in extreme cases, is not to be made by the application of any rule of thumb. . . . Rather, it calls for the exercise of a sound discretion as to whether the question, even though it does not contain all of the facts in evidence, presents the facts in such a manner that they bear a true and fair relationship to each other and to the whole evidence in the case . . . is not so worded as to be likely to mislead or confuse the jury; and is not so lacking in the essential facts as to be without value in the decision of the case." (Citations omitted.) *Floyd* v. *Fruit Industries, Inc.*, supra, 144 Conn. 666; see also *State* v. *David N.J.*, 301 Conn. 122, 133–34, 19 A.3d 646 (2011) (applying rule from *Floyd* and citing commentary to Connecticut Code of Evidence § 7-4 [c] for proposition that rule is " 'applied with increased liberality when the hypothetical question is framed on cross-examination and for the purpose of impeaching and testing the accuracy of the expert's opinion testimony given on direct examination' ").

[20] We note that, at this point, the defendant moved for a mistrial, claiming that it was warranted because of the medical records comment and the prosecutor's failure to adhere to the evidentiary ruling. The trial court denied the motion. See part II of this opinion.

[21] Practice Book § 40-12 provides in relevant part: "Upon written request by a defendant . . . the judicial authority may direct the prosecuting authority to disclose in writing to the defendant and make available for inspection, photographing, copying and reasonable testing any other relevant material and information not covered by Section 40-11 which the judicial authority determines on good cause shown should be made available."

[22] At trial, the court initially expressed its concern about this line of questioning on the ground that the prosecutor had not complied with § 7-4 of the Connecticut Code of Evidence by phrasing the questions as hypotheticals. Defense counsel, however, stated that his concern was that the state had failed to advise him, in response to his motion seeking the disclosure of uncharged misconduct, "of a threat that was made by my client to his girlfriend involving a knife in which the knife was removed from his physical being." After the state argued that the trial court previously had barred it from offering evidence of that event, the trial court directed the state to ask the questions in the form of a hypothetical, with a witness to testify to that point during the state's rebuttal case.

With respect to the disclosure issue, the state contended that its obligation was limited to uncharged misconduct to be offered during its case-in-chief to prove motive, identity, or corroborate crucial prosecution testimony, and that it could appropriately use the misconduct to challenge Feuerstein during cross-examination. The defendant, however, argued that the state was engaging in "trial by ambush" because he was unaware of the information, despite the state's prior disclosures and the open file policy. Accordingly, the defendant moved for a mistrial. In response, the state argued that information about the hospital visit was contained in the medical records that had been disclosed by the defendant, but acknowledged that the knife incidents were obtained from witness interviews with the defendant's friends, which were not conveyed to the defendant because the state did not deem it to be "criminal behavior" or offer it during the case-in-chief.

[23] In the additional facts section of his brief, the defendant also recites numerous other comments during the prosecutor's closing and rebuttal arguments that he claims are improper. The defendant does not, however, provide any analysis in his brief supporting a claim that those particular arguments were in fact improper. Accordingly, we view the defendant's citation to those arguments as intended to support his claim, in the due process analysis, that the prosecutors "capitalized" on misconduct during Feuerstein's cross-examination by using that impropriety to support themes developed during summations.

[24] The defendant also asks us to use our supervisory powers over the administration of justice to reverse his conviction. As an alternative to concluding that prosecutorial impropriety deprived a defendant of a fair trial in a particular case, "we exercise our supervisory authority in this context to redress repeated and deliberate misconduct by a prosecutor seeking to increase the likelihood of conviction even though that conduct does not necessarily require reversal as a due process violation. . . . [W]e pay particular attention to the fact that the prosecutor knew or should have known that the conduct was improper and was part of a pattern of similar misconduct in other cases. We exercise our supervisory authority in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of

a particular trial. We do so in order to send a strong message that such conduct will not be tolerated." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 451–52, 797 A.2d 1088 (2002). Reversal under our supervisory authority is an appropriate response to deliberate prosecutorial impropriety that "is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." *State* v. *Ubaldi*, supra, 190 Conn. 575.

Consistent with the "elephant in the room" at oral argument before this court, the defendant cites *State* v. *Santiago*, 143 Conn. App. 26, 27, 66 A.3d 520 (2013), wherein the Appellate Court recently utilized its supervisory powers to reverse a murder conviction on the ground that Attorney Mariani, the prosecutor who cross-examined Feuerstein in the present case, "has engaged in a deliberate pattern of improper conduct in this case and others, and he remains undeterred by pronouncements by [the Appellate Court] and our Supreme Court that his conduct was improper, we believe that nothing short of reversal will have the effect of deterring him." Given the relatively minor nature of the impropriety identified in the present case, and the fact that the defendant has not identified a post-*Santiago* wave of deliberate impropriety by Attorney Mariani that requires another reversal for deterrent or sanctioning purposes, we decline to exercise our supervisory powers to reverse this conviction, notwithstanding Attorney Mariani's choice of an advocacy style that renders him a prosecutorial Icarus flying near the sun of reversible impropriety.

[25] The defendant also includes in his brief a discussion and citations to case law suggesting that the trial court abused its discretion by admitting the uncharged misconduct into evidence. The defendant does not, however, identify any such ruling by the trial court admitting such evidence; indeed, the trial court struck such references from the record and directed the jury not to consider them. Accordingly, we decline to consider this claim as one challenging an evidentiary ruling.

[26] The defendant also cites the testimony of Jason Benoit, who, while testifying about the events of the day when the defendant confessed to killing the victim, mentioned—without prompting from the prosecutor—that the defendant "showed up at my house alone and he came inside, we smoked some weed, sat down and talked and that's when he broke down and told me what had happened." After some discussion between the parties and the trial court about this testimony given a motion in limine addressing marijuana use, the defendant declined the offer of a curative instruction and the prosecutor represented that she would admonish Benoit and other witnesses not to talk about the posthomicide marijuana topic in future testimony. Defense counsel did not, however, move for a mistrial with respect to Benoit's testimony about the marijuana, and has not specifically included it as a "cumulative" ground for a mistrial before the trial court. Accordingly, we decline to consider it further in this opinion.

[27] Defense counsel then assented to the trial court's proposal not to draw specific attention to Innaimo's comment, but simply to "make one general comment to you. You should understand clearly that the defendant here is on trial only for the crimes charged in the information not for any other activities. I just want to make that statement to you."

[28] The trial court instructed the jury that: "You heard no evidence that the defendant threatened to kill or stab his girlfriend. You can't consider it in any way at this point.

"Second, the issue of reasonableness of the defendant's actions is a question for you, the jury, to determine. Any questions and answers during the state's cross-examination related to the issue of the reasonableness of the defendant's action you cannot consider in any way and those questions and answers have been stricken from the record.

"Finally, the evidence that you can consider are the responses of the witnesses. The questions that are asked are not evidence. It's the responses that are the evidence and the full exhibits that you will have to consider during your deliberation. Questions, arguments are not evidence. The evidence is the answers to the questions that are posited by the attorneys."

[29] We note that it is undisputed that the defendant preserved this claim through a motion for a judgment of acquittal, which the trial court denied.

[30] Practice Book § 42-15 provides: "The judicial authority to whom a matter has been referred for trial may in its discretion entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. Such motion shall be in writing and shall describe the anticipated evidence and the prejudice which may result therefrom. The judicial authority may grant the relief sought in the motion or such other relief as it may deem appropriate, may deny the motion with or without prejudice to its later renewal, or may reserve decision thereon until a later time in the proceeding."

[31] We disagree with the defendant's argument that it is "impossible to meaningfully distinguish between the allowed testimony of [Trazanda]

Brown concerning a homosexual encounter of the defendant, and the testimony of Ingram, concerning a homosexual encounter with the victim." Brown, a friend of the defendant and the victim, testified that the defendant did not react adversely to learning that he had danced with and kissed a man who was dressed as a woman at a party. The trial court reasonably could have determined that the *defendant's* reaction to a same sex sexual encounter was relevant to whether a sexual advance by the victim would have triggered an extreme emotional disturbance. In contrast, the victim's sexual orientation, which was implicated by Ingram's testimony, was not a disputed factual issue in this case.